Good afternoon. May it please the Court, I am Blake Johnson, appearing on behalf of Victory Processing, LLC, and David Dishaw, the appellants in this matter, with me at counsel table is co-counsel Jim Brown. Montana's robocall ban, a statute that regulates speech based on topic, including specifically targeting political speech, is unconstitutional. The District Court was correct in finding that the statute was a content-based regulation of speech and therefore strict scrutiny applied. However, in concluding that this was one of those rare instances where a statute would withstand strict scrutiny, the District Court erred. Under strict scrutiny, the statute is presumed to be unconstitutional and thus the burden is upon the state to demonstrate, to present evidence and prove that it has a compelling interest and that the statute is in fact narrowly tailored to achieve that interest. What happened to the Wyoming case? In Wyoming, I know it was dismissed. No, actually no. In Wyoming, they were very similar procedurally to what took place in Montana. There were cross motions for summary judgment and the District Court concluded that the Wyoming statute was in fact unconstitutional, that it did not satisfy strict scrutiny. But then it was appealed. There was no appeal taken. I thought it was appealed and dismissed. There was no appeal taken? I apologize. There was, on the issue of attorney's fees, there was some subsequent appeal. I know there was something on appeal and then when I looked, it said it was plain as dismissed in October. That's correct. We voluntarily withdrew the appeal on attorney's fees once the District Court had ruled on our motion. So, you're making the robocalls in Wyoming? We are. Without an introductory person? Correct. And in many other states, to be clear. I think that every state has regulated robocalls in one form or another. And what we've seen with the cases that have examined these state statutes, one common thread is that when it's content neutral, when it's done in a content interest in protecting residential privacy, and that interest is substantial, and they uniformly have upheld those statutes. However, when they are content-based, the statutes have been struck down, as was done in South Carolina, Arkansas, and Wyoming. That's where we are here today. We have a content-based statute and the state has failed to present any evidence that it has a compelling interest in regulating political speech, among other three or four other topics, differently than any other form of speech. And they've also failed in showing that the statute's narrowly tailored to advance the interest. So if they said no robocalls, it'd be okay? If the statute was content neutral, for example, in Indiana, they have a statute that is a content neutral. It says no robocalls. It calls them all out, flat out, across the board. And then allows for an exception in the event of a live operator for certain situations. Or allows calls to be made in certain situations, assuming they're preceded by a live operator. In the Seventh Circuit, in the Indiana case, found that to be appropriate. And I think that that approach is consistent with what the Ninth Circuit has done with respect to California statutes, the public utility statutes in California. In Bland v. Fessler, for example. Where it said, you know, if it's content neutral, there's a substantial interest. And the state can regulate these calls. And if we want to allow for some exception, including a live operator, it makes some sense. And so I think, yes, certainly the state could regulate robocalls. Montana could do this. But they need to do it in a constitutional manner. In a way that is content neutral. Because I don't think that the statute can be shown to survive strict scrutiny. Montana's statute on its face does not show what its intended purpose was. So the... Can't you just infer that it was residential privacy? I don't know that it's appropriate to infer what the intent of the legislature is. Well, I think in a situation like this, it's the government's burden to prove what its intent was or what its purpose is. And that it has a compelling interest. Weren't there some statements that they were concerned about privacy? There was... Within the Montana statute's legislative history, there were some statements. There was a single statement by one lawmaker that said, there's a right to privacy and this supports that. That's really the only discussion of privacy. There are, from the sponsor of the bill, there are multiple statements concerning the potential for automated calls to tie up phone lines. At the time when an automated call was made and a person hung up, it didn't automatically disconnect. But at the time, that would happen with normal phone calls sometimes. If the individual on the other line, whether it was an automated call or not, if they didn't hang up back in 1991, that was just the result. That was how telephone lines worked. Well, now if you hang up, it stops? I don't know if we can say that as a general matter, but I think yes. Technology and some states have used automatic disconnect requirements. For example, that's a plausible, less restrictive alternative that we proposed, both at the District Court and here, that would arguably address what the legislature said they were specifically concerned with, which was this failure to disconnect. So the state didn't really address or prove why that would not be an effective way of approaching their stated interest. Even if we assume that residential privacy is the state's interest and we assume that it rises to the level of compelling, the state still hasn't shown that it's narrowly tailored. You've called out five areas of speech. If residential privacy is the concern, why are some robocalls on some topics acceptable while others are not? It wouldn't make a difference with respect to privacy. And for that matter, if you have a live operator on the other end of the line, it doesn't – there's kind of a question of whether does that really advance the interest of residential privacy, because once an individual has picked up the phone and they discover that, oh, it's a live operator, it's not an automated message on the other end of the line, presumably the intrusion has already occurred. So I think that in those respects that there's been a failure to show that it's narrowly tailored. Along – within the narrowly tailored analysis, the government still needs to show that it is targeting the exact evil that they're attempting to address. And here, there were discussions within the Montana legislative history about the proliferation of commercial sales calls. There's no discussion about a problem concerning political calls or robocalls made for political purposes. And so I think it's – the burden is upon Montana to show why they've called out political speech for differential treatment, that there's actually a problem. Counsel, let me ask you a question on that. Yes, Your Honor. On all the other cases around the country in which robocalls have been an issue, have all those courts applied the compelling state interest test, or have some applied some form of intermediate scrutiny? In both instances. Some courts have applied when there has been a determination that it was a content-based statute or that it regulated in a content-based manner, they applied strict scrutiny. And with respect to those state statutes, they've been struck down. When they've – the courts have found that it was content neutral, that it didn't call out speech based on topic, they applied intermediate scrutiny. And as far as I know, they have substantial interest under an intermediate scrutiny in regulating robocalls for purposes of residential privacy, and that at times it's narrowly tailored, even if you provide certain exceptions for pre-existing relationships, for example. Okay, thank you. The other question I have here is, when you deal with political speech by robocall, does that raise the threat that if unlimited robocalls are permitted that where political speech can't be singled out because then it's content-based, that that's going to end up making the politics in our country more like a plutocracy than democracy because the richest people can fund the most robocalls? It's an interesting way of looking at it, but I think in some sense it's backwards because I think robocalls have been shown to actually be a cheap alternative or a cheap way to get message, political messages or any type of message, widely disseminated. It's actually a cheap technology to use as opposed to an expensive one that would be used by only the wealthy. So I think it's certainly relevant that you're sort of foreclosing this avenue, but I think what the district court here did incorrectly in their decision, they kind of meshed together both intermediate scrutiny principles and strict scrutiny principles. They announced that they're applying strict scrutiny, but then they analyzed whether there's ample alternative channels of communication and say that, well, the live operator essentially provides you an alternative means of communicating with people. You don't have to do it through robocalls, but that's not a relevant factor if you're dealing with a content-based regulation subject to strict scrutiny. And I think with the live operator, you've seen the live operator analyzed both at the state level and under the TCPA, the Federal Telephone Consumer Protection Act. And when the courts have analyzed the live operator provision, they have found it to be a narrowly tailored method of regulating, but only in the context of a content-neutral statute, one that has already called out everybody. So they've said no robocalls can be made, but if you fall under certain circumstances, you can do it if you're preceded by a live operator. One other issue that was raised by the state was whether or not you had standing, although they put it in terms of, I guess it was statutory standing, or I forget what it was. But is there really an injury here? Yes, Your Honor. And I think that victory processing, the issue of standing was raised and briefed at the district court level. And if you look to the statement of facts within our briefs, I think it supports our standing. There is, Mr. Dishaw submitted an affidavit, which is contained within our excerpts of record. And the injury is, they satisfy Article 3 standing. There is, part of the messaging that they do is for their own purpose. And they've attested to the fact that they've engaged in self-censorship, which is a constitutionally recognized injury for purposes of the First Amendment. And so when you apply sort of the traditional Article 3 standing of injury, causation, or addressability, certainly the self-censorship that they've engaged in and attested to in the record provides the injury. And then the causation and redressability are certainly triggered by the statute. If the statute is struck down, then it's redressed. They've also argued that we don't meet the prudential limitation for third-party standing. But I think that the record indicates that we would meet that, too. I think the state incorrectly says that we have to show the factors from the case, the Wasson case. And I think that there's actually a different analysis that applies in the context of a First Amendment case that was set out in the Supreme Court's case in State of Maryland v. Munson Company, 467 U.S. 947. Where, in order to have third-party standing under the First Amendment, the plaintiff just has to demonstrate that they have an injury in fact, which is the self-censorship here, and that they can satisfactorily frame the issues. Certainly a statute that is directed at companies like Victory Processing, a plaintiff who is a robo-caller could satisfactorily frame the issues that would be presented to the court in this challenge. And so the state's argument with respect to standing has no merit. Victory is not merely a conduit. They engage in their own speech. But the statute is also overly broad. And under Munson, Victory Processing would be able to assert sort of the injury on behalf of those third parties as well. Okay. If there's no further questions, I'll reserve the rest of my time for rebuttal. Thank you, Counsel. Thank you. Good morning. May it please the Court, I'm Pat Riskin here on behalf of Defendant Fox in the State of Montana and Counsel. Your Honor, to take the last point first on standing, the point that we're making in this case is that we have an unverified complaint that makes certain factual allegations regarding unknown third parties' inability to make their speech, to deliver their speech. We have just heard about a case from, you know, outside of the Ninth Circuit. Wasson was a First Amendment case. And our point here is that for the second and third prongs of the Wasson test, we have no evidence. This is not a Rule 12 motion. The Victory brought this as a summary judgment motion. And under Rule 56, that's the time to test your claims and that's the time to test your allegations. We tried to get that evidence. We were buffed. So all we had going into the District Court hearing was the allegations of the complaint that have never been verified by anybody. That's our point. There's nothing to suggest that any of this speech is Mr. Dyshaw's or Victory's. They have admitted in the discovery that they did answer that it was not their speech, that they don't have political speech. They are a conduit in our view. And then we have absolutely nothing to connect their complaints to these unnamed third parties. We don't know who they are. We could never follow up. And so once again, we are just, we're just, we have to settle for the allegations of an unverified complaint. Why do you need to know who the third parties are? Your Honor, honestly, through the discovery process and the way that I pursue cases, if I would have known, I could have called at least one person and asked them, is this really something that happened to you? It wouldn't necessarily be made public. I would just like to know so I can verify the allegations in the complaint. It's part of my discovery process in a lawsuit. Well, they do allege that, you know, that's their business is to engage in this robocall, that they did it in the past, that they are advised by their counsel that they can't do it unless they comply with the voice introduction. And that's what they're alleging in that regard. They did? Yes. I'm sorry. And they say that they would like to do, go forward, they would like to do it again without the voice, without a live voice. And, Your Honor, that I believe applies to the first prong of Wasson, which is the injury in fact. And that's what they're alleging in that regard. But then we get beyond that into whose speech it actually is. And it's admittedly not the plaintiff's political speech. It's somebody else's. So they're bringing the claim on behalf of somebody else's. They have alleged. And, you know, for that matter, we don't contest that they probably have suffered that injury, that prong of the Wasson case. But we have nothing to back up the other two prongs. All right. Counsel, did the district court assess this issue under the standards for a reasonable time, place, and manner restriction? Your Honor, it did. And it did so very briefly. With regard to this case, I mean, it was literally one paragraph. And then the district court moved right into the strict scrutiny analysis. So I can't tell you precisely what the district court did. It's in the order. I honestly cannot tell you exactly what it said. It was in and out real quick. Oh, that's fine. Thanks. Thank you. Now, to get back to the claims that are made here, the district court did the only way to get to where Victory wants to go is to consider this statute to be a ban. And we've heard that time and time again in the briefing in this case. And the only way to get to that point is to excise the last sentence of subsection 2 of Montana's statute, excuse me, which allows robocalls and recorded messages to be delivered to the with the introduction by a live operator. And it's not topic specific. What the district court pointed out to us all is that the Montana statute, when analyzed, and we have to interpret this from top to bottom, but when the Montana statute is analyzed in total, what we find is subsection 1 is pertinent to what we used to call cold calls. They're uninvited. There is no relationship. There may be no relationship. These are unannounced, unexpected. Subsection 2, which has some exceptions, all involves an implied consent, an existing business relationship, something of that nature in which the call would not be totally unexpected. But then at the very end of subsection 2, there's one sentence that says if the call is roughly what it says is if the call is introduced by a live operator, that's going to be fine. And so what it's done is it has, and as the district court pointed out, the entire statute is based upon the consent of the call recipient, either expressed or implied. And the benefit to that, as has been pointed out, and I'm getting into the narrow tailoring now, but as has been pointed out specifically in the Van Bergen case, is the benefit of that interaction with a live operator is that the call recipient now has some control. They can question. They can ask who is it, what's it about. They can reject it out of hand. Before they begin to hear the message, they can reject it. They can reject it, and then they can take the additional step of saying, please put me on the list. I don't want to hear this again. Because remember that if we're just listening to a recorded message, especially either at year-end car sales, it could be. It could be political campaign season. When we're listening to that message, it could come night after night after night. You have an opportunity to talk to the operator and say, I don't want to be on your list anymore. You could ask the operator, for example, I don't have time for it right now. Would you please put me on the list for some other time so that you could listen to it? There's a  Let me ask you this. I don't. So is your argument that this satisfies narrow tailoring Yes. Do you agree that the statute, it's 45-8216 subsection 1A through D, and promoting a political campaign or any use related to political campaign. Do you agree with the plaintiffs that that's a content-based restriction? On its face. You do? Well, we approached it in our briefing to the district court from both angles. We submitted to I just want to know if you basically agree with that. I'm trying to figure out where this last sentence fits into the analysis. Right. If I may. All five subsections of Section 1A are subject to content-based restriction. Section 1 of the statute, all five, generally describe topics of speech, arenas of speech. We look at, like, for example, subsection C, which is soliciting information. That's a really general statement. If you look at all of them together, I would submit to you, Your Honor, that what we're doing is we're really taking a look at virtually every type of speech that can be imagined here. There's commercial, there's sales, there's solicitation, polling, information gathering. And then finally, a general statement about political activity. It doesn't say, it doesn't limit it to a particular campaign. It doesn't limit it to particular races. It is a general statement. So from once again, from top to bottom, the district court. But even if you were to consider it to be a content-based under-read, which says a common-sense approach to this, as if it calls it out on the face of the statute, it is content-based. It seems like it's content-based. Well, under-read, it would appear that way. So then it's subject to strict scrutiny? And the district court analyzed it, did that, yes. And there's a compelling interest? Yes. Now, he complains that the Montana legislature didn't say anything about what was the purpose of this, but it seems like it's privacy. Well, it is privacy. And the compelling interest is one of the interesting issues in this case because it's one of these situations that I would submit to you has developed over time. The cases that we take a look at from early on with regard to picketing, people standing on your sidewalk, sound trucks, that type of thing, there's a variety of different cases. The Kerry case, the Frisbee case, the Kirkby case are all picketing cases. The Kovacs case is the sound trucks. Hall is door-to-door sales. And these are all, you know, decades ago. But then we get into the advancing technology that's involved in this particular arena. And before I get there, then we have mail. I'm sorry, I skipped over the mail because we have Hall and we have Consolidated Edison and Rowan, I'm sorry. And now the speech is on the sidewalk. Now it's in your home, but it's fairly passive. But then we find ourselves with the Satterfield case, the Ninth Circuit case from 2009, which dealt specifically with the TCPA. And that was the first indication that this court considered this to be an invasion of privacy, that there's a concern here with individual residential privacy. The shift that we find at this point is that now the sound is in your house. Now there's been an intrusion. And really it's landing in your ear when you pick up your phone. And so from that point forward, and specifically from 2017 forward, in TCPA cases, and I think there's one other case, it's a state statute and I can't remember which one it is, but all these cases that we've cited, the Brickman, Holt, Mejia, Greenlee, Sessions, Gallion, all of those cases have found this to be a compelling state interest because, I would submit to you, of the advancing technology that's involved here. And there's got to be some control that's available to the public. And so the state has an interest, a compelling interest, in the consumer. So if we agree with you that there's substantial interest at stake here, or a compelling interest, is it narrowly tailored to further the state's interest? Yes. Because, Your Honor, Is that where you contend that this last sentence comes in, in Section 2? Yes, sir. I do. And the reason for that is because when you take a look at cases like Cahali or Rutledge, or, and I can't remember what else that Victory has cited, there's all some nuance that's involved. There's a distinction that's been made that we can draw from the Montana statute. The last sentence of Subsection 2 allows robocalls in any event. Cahali provided a live operator option only in certain circumstances, but had nothing to do with political speech. That was banned. So it was over-inclusive. I believe that Rutledge, in Arkansas, didn't even provide for a live operator option in any event. And, Judge Jack, this gets back to your questions about the Wyoming case. Because the judge in Wyoming, I think his name is Johnson, I can't remember, but he was following along quite nicely with this case, with our case, except when he got to the point, and he distinguished this, except when he got to the point that there was no option for a live operator, as was provided in the Montana statute. There was, I believe with regard to commercial sales, there was another statute that provided for a live operator option under very certain circumstances. But once again, it was determined to be over-inclusive. That was the distinguishing point of that. And I got the sense from reading that case that he really wanted to go the same direction as we've done in this case, but he couldn't, because that one allowance of a live operator was not present. Counsel, let me ask you one question, so I make sure I understand this content specific or content neutral issue. If the Seahawks wanted to try to sell tickets by robocall in Montana, would they have to have a live operator? Yes. Under this statute, they would. Because there's no pre-existing relationship with the call recipient, I'm assuming that, they're not prior season ticket holders, and so there's no pre-existing relationship. There's nothing in subsection 2 that would allow that call based upon an implied consent. Then let's say Microsoft wanted to sell computer programs to people who hadn't already bought them. Could they do that by robocall? Not under this statute. They couldn't. Because that would be a cold call under whichever of the, I can't remember which one it is with regard to soliciting sales. I think it's the first subsection A. So let's say I bought Microsoft Windows from them. All right. But they wanted to sell me 10 other programs. Could they use robocalls if I hadn't clicked something saying that I consented to it? Over the computer? This statute deals with telephonic transmission. Okay, so then the answer is, okay, Microsoft couldn't do it. Sorry, Your Honor. Saying Microsoft couldn't do it, and Seahawks couldn't do it. Who would, as to whether this would be able to make calls without regard to the statute? Could you restate that, Your Honor? I'm sorry. I'm still trying to understand if this is content-specific or content-neutral in light of all the categories of people who've got these categories, this requirement. Can anybody make a robocall that's not excluded in this statute? Your Honor, the only one, I'm sorry, Your Honor, I apologize for that. The only one that I can think of is charity. Who? Charity. That's the only one that I can think of. Who's that? Any charity. Oh, a charity. A charity. Oh, a charity. Sorry. Yeah, so. What? Some woman. So United, yeah, I was just going to ask you, could United Way do a robocall? Something like that, and perhaps. Red Cross, right? Yes, and perhaps that's because charity occupies a special place in our society and in our hearts. Begins at home. I'm sorry? Begins at home, therefore residential. It begins at home. Perhaps that's it. That's the only one that I can think of, Your Honor, is charity. I think, I would submit to you that everything else is covered under subsections 1A through 1E, and I see that my time has expired. Thank you. We took you over your time with our questions. No, that's fine. We appreciate it, and we'll let the appellant have a couple of minutes in rebuttal. Thank you, Your Honor. If I may close, this, with the advancing technology and with the case law that is keeping up with it now, we believe that the, we would submit to the court that the district court's order was very thorough. It explained the consent aspect of this statute thoroughly, and that we would ask that the decision be affirmed. Thank you. Thank you, sir. Thank you. And now rebuttal. Why don't we add two minutes for rebuttal, if you need it. Thank you, Your Honor. I'll just follow up a couple of points that the State made concerning standing where we kind of left off. The allegations in the complaint were all essentially verified through the affidavit that was presented by Mr. Dishaw, and again, the affidavit demonstrates that the speech is, in fact, Victory's own. With respect to the content neutrality and the operation of this live operator provision, we don't get to the need for a live operator until the content-based regulation has already occurred. You've already, in the discussion with Mr. Riskin, it was identified that a charity wouldn't ever have to get to the live operator. They could proceed with their robocalls without the need for one. And so I think that right there is an indication that this is, in fact, a content-based statute. The example that you're providing with the Seahawks, I might suggest that they were calling all the folks up in New England or something and harassing them rather than selling tickets. They're just trolling them with robocalls and talking about a game coming up. But that wouldn't be prohibited under the statute because it would relate to sports, and that has nothing to do with the five topics that are called out. The state needs to provide, needs to show that the live operator exception is not just an okay avenue to do it. It has to show under strict scrutiny that it's the least restrictive alternative available. So that's where that comes in, whether it's a least restrictive alternative? Correct. When you're in strict scrutiny, and the district court, I think, incorrectly states that the least restrictive alternative is not required, and they're citing Ward v. Rock v. Racism. But Ward v. Rock v. Racism was an intermediate scrutiny case. It was a content-neutral regulation. And under intermediate scrutiny, you don't have to have the least restrictive alternative, but that's not the case in strict scrutiny cases. So in terms of whether this is content-based and goes into strict scrutiny, is one exception for charities, if charities were the only people who are not covered by this insubstance, would that be enough to go to strict scrutiny? I believe so. I believe so, because you're still calling out a select group for deferential treatment and allowing charities, even if they're the only ones, to operate differently. And you can do that if you had a compelling interest in doing so, and you could show that you were narrowly tailored. But it makes it a content-based regulation. Just allowing charities opens up a whole new Pandora's box of some charities may be actually political statements. Certainly. And I think here we're dealing with a group that engages in political speech, but a charity would certainly engage in political speech as well. So I see that I'm out of time. If there are no other questions, thank you. Thank you. We appreciate the excellent argument both from Montana Council. Is that Lincoln, Nebraska? Yes, Your Honor. And Lincoln Council. We don't often have distinguished visitors from Nebraska, but we often have been your advocacy. A victory processing case shall be submitted, and we'll get a decision to you in due course. Then I think that's it for today. Thank you. So therefore, we will adjourn for the day with thanks. All rise. This court for discussion stands adjourned.
judges: Gould, Paez, Jack